# SEALED

Kathryn W. Drey, Esq.
16777 Perdido Key Drive, Ste 507
Pensacola, FL 32507.
kathryndrey@kathryndrey.com
(251) 377-2914
Attorney for *Qui-Tam* Plaintiff
FRAUD FORENSICS, LLC

FILED BY _KP_ D.C.

OCT 2 3 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FRAUD FORENSICS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>VILLA MARIA NURSING & REHABILITATION CENTER, INC., CATHOLIC HEALTH CARE TRANSITIONS SERVICES, INC., ST JOHNS REHABILITATION HOSPITAL AND HEALTH CARE CENTER, ST. ANNE'S NURSING CENTER & ST. ANNE'S RESIDENCE, INC., VILLA MARIA HEALTHCARE SERVICES INC., ST. JOSEPH RESIDENCE, INC., CATHOLIC HOME HEALTH SERVICES OF BROWARD, INC., CATHOLIC HOSPICE INC., CATHOLIC HEALTH SERVICES, INC., and DOES I -X,<br><br>Defendants. | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 UNITED STATES CODE § 3730]**<br><br>**FILED UNDER SEAL [DO NOT PLACE ON PACER]**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY**<br><br>Case No.<br><br>Judge: |

## COMPLAINT

### I.   INTRODUCTION

1.    This is a qui tam action filed under the False Claims Act, 31 U.S.C. § 3729, et seq. (the

"FCA"), arising from false and fraudulent statements, certifications, and conduct by Defendants in

connection with application for, receipt and retention of Paycheck Protection Program ("PPP") funds arising out of and during the coronavirus, COVID-19 pandemic.

2.      Faced with the coronavirus pandemic threat, Congress enacted the Coronavirus Aid Relief, and Economic Security Act ("CARES Act"), which included the Paycheck Protection Program ("PPP"), a program implemented by the United States Small Business Administration ("SBA") with support from the Department of the Treasury. The Paycheck Protection Program authorized loans to small businesses, enabling them to retain workers and pay certain other expenses through the severe economic disruption caused by the pandemic.

3.      The SBA passed rules limiting the types of borrowers who were eligible to receive PPP loans and those eligible for forgiveness of their loans. These limitations included criteria based on employee headcount, revenue volume and net worth, all designed to ensure that properly qualified borrowers would receive funds which would allow them to keep their workers on payroll during the pandemic disruption.

4.      On March 26, 2021, the United States Office of Public Affairs released the following statement: "The Department of Justice has led an historic enforcement initiative to detect and disrupt COVID-19 related fraud schemes," said Attorney General Merrick B. Garland. "The impact of the department's work to date sends a clear and unmistakable message to those who would exploit a national emergency to steal taxpayer-funded resources from vulnerable individuals and small businesses. We are committed to protecting the American people and the integrity of the critical lifelines provided for them by Congress, and we will continue to respond to this challenge."

5.      This action alleges that each Defendant was factually and legally ineligible to receive PPP funds under the underwriting standards established by the SBA eligibility rules. Plaintiff will show, using factual and evidentiary proof, that Defendants fraudulently applied for and received PPP loans in violation of the False Claims Act and/or fraudulently requested and received PPP loan forgiveness.

6.      This Action is brought by the Relator Fraud Forensics, LLC ("Relator") on behalf of the United States of America (the "United States" or the "Government") and against named defendants,

Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St. Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc., alleging violations of the FCA. Relator claims entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff, as authorized in 31 U.S.C. § 3730 and related statutes.

7.      Through this action, Relator seeks to recover millions of dollars in damages and civil penalties on behalf of the United States of America arising out of Defendants' and/or their agents and employees' multiple false and fraudulent applications, certifications, representations, records, statements and claims, which were made and/or caused to be made to the SBA or its approved lenders, in order to procure PPP loans and/or to achieve forgiveness of PPP loans, in violation of the FCA. As a direct result of their false and fraudulent statements, applications, certifications, and representations to the SBA and its approved lenders, Defendants collectively obtained $18,316,680 (Eighteen Million Three Hundred Sixteen Thousand Six Hundred Eighty Dollars) in PPP loans they were not eligible to receive.

8.      Through this action, Relator seeks to recover $18,774,634 (Eighteen Million Seven Hundred Seventy-Four Thousand Six Hundred Thirty-Four Dollars) or more in damages, plus civil penalties, attorneys' fees, fees paid by the SBA for loan processing, accrued interest and allowable costs on behalf of the United States of America, arising out of Defendant's and/or its agents' and employees' false and fraudulent applications, certifications, representations, records, statements, and claims, made and/or caused to be made by Defendants to the SBA or its approved lenders, in acquiring PPP loans, and later receiving forgiveness of those loans, all in violation of and as authorized under the FCA.

9.      In October 2009, the Government Accountability Office released Report 10-108, in that instance involving loan funding for assistance to service-disabled veterans,[1] which found in relevant part

---

[1] Case Studies Show Fraud and Abuse Allowed Ineligible Firms to Obtain Millions of Dollars.

that: "By failing to hold firms [i.e., ineligible, fraudulent borrowers] accountable, SBA and contracting agencies have sent a message to the contracting community that there is no punishment or consequences for committing fraud." The instant civil action is an effort to assist the SBA in fulfilling its objective of holding fraudulent, non-entitled PPP borrowers accountable to clearly-defined and readily understood lending standards and to recoup the Government's monetary losses resulting from these PPP-Borrower Defendants' fraudulent acquisition and/or forgiveness of PPP loan funding.

## II.   PARTIES, JURISDICTION, AND VENUE

10.   Relator, Fraud Forensics, LLC, is a Wyoming Limited Liability Company (herein "Relator" or "Plaintiff") formed and dedicated to providing fraud notification to the Government through the U.S. SBA Office of Inspector General (SBA-OIG) and the United States Department of Justice (DOJ), for the ultimate benefit of the U.S. Treasury and taxpayers. Relator has engaged in extensive and costly research and investigations to compile evidence, data, information, and documentation concerning Defendants' fraudulent PPP loans and subsequent loan forgiveness, and to provide that evidence to government attorneys, agencies, and prosecutors, inclusive of the DOJ and SBA, to recoup ill-gotten gains, damages, fees costs, interest and civil penalties from the fraudulent PPP borrowers. The Relator's team includes an experienced SEC fraud investigator, a former FBI financial crimes analyst, and an expert in material disclosures to public securities markets.

11.   Defendant, Villa Maria Nursing & Rehabilitation Center, Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 1050 NE 125th St. North Miami, FL 33161.

---

https://www.gao.gov/assets/gao-10-108.pdf

12.     Defendant, Catholic Health Care Transitions Services, Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 3075 NW 35TH Avenue Lauderdale Lakes, FL 33311.

13.     Defendant, St. Johns Rehabilitation Hospital and Health Care Center, is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 3075 NW 35TH Avenue Lauderdale Lakes, FL 33311.

14.     Defendant, St. Anne's Nursing Center & ST. Anne's Residence, Inc, is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 11855 Quail Roost Drive Miami, FL 33177.

15.     Defendant, Villa Maria Healthcare Services Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 1050 NE 125TH Street North Miami, FL 33161.

16.     Defendant, St. Joseph Residence, Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 3485 NW 30TH Street Lauderdale Lakes, FL 33311.

17.     Defendant, Catholic Home Health Services of Broward, Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 3075 NW 35TH Avenue Lauderdale Lakes, FL 33311.

18.     Defendant, Catholic Hospice Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 14875 NW 77TH Avenue Suite 100 Miami Lakes, FL 33014.

19.     Defendant, Catholic Health Services, Inc., is a Florida corporation or other legally formed entity, organized, existing, and conducting business at 4790 N State Road 7 Lauderdale Lakes, FL 33319.

20.     All of the Defendants named in this Complaint operate under law as non-profit organizations exempt from state and federal tax obligations.  A non-profit organization operates for

purposes other than generating profits, by which no part of the organization's income is distributed to its members, directors, or officers.  Plaintiff alleges that Defendants enjoyed that tax-exempt status while applying for and receiving the fraudulently induced PPP loans.

21.     Some states, have adopted the Revised Model Nonprofit Corporation Act (1986). Under the Revised Model Nonprofit Corporation Act (1987) § 14.30, a court may dissolve a non-profit corporation (1) in a proceeding by the attorney general if it is established that the corporation has continued to exceed or abuse the authority conferred upon it by law; or if the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent.

22.     In Florida, the Secretary of State's authority to dissolve a non-profit corporation due to fraudulent activities or other violations under Florida Not for Profit Corporation Act Section 617.1430 - Grounds for administrative dissolution: This section provides the grounds under which the Department of State can administratively dissolve a non-profit corporation. It includes failure to comply with the laws governing non-profit corporations and other violations, and Section 617.1430(1)(b) - Grounds for dissolution: Specifically, the Secretary of State can dissolve a corporation if it is determined that the corporation has engaged in fraud or other actions that are inconsistent with its articles of incorporation or purpose.

23.     Government agencies, such as the Internal Revenue Service (IRS), can take action against a not-for-profit corporation for their fraudulent activities, including revoking their tax-exempt status. Other consequences that may result from a not-for-profit's fraudulent improper conduct include the potential imposition of back taxes, and the individuals perpetrating the fraud being subject to civil and/or criminal penalties.  The seriousness of these consequences underscores the importance of transparency, integrity, and lawful compliance with PPP loan eligibility and compliance rules by tax-exempt entities, such as Defendants, which Relator alleges here were violated.

24.     Plaintiff/Relator is informed and believes and thereon alleges that the information, allegations, and transactions involving Defendants that are the subject of this Complaint are not the subject of a civil suit or an administrative civil monetary penalty proceeding in which the Government is

already a party. Plaintiff/Relator is further informed and believes and thereon alleges that the information, allegations, and transactions that are the subject of this Complaint have not been "publicly disclosed" in any of the manners specified in 31 U.S.C. § 3730(e).[2] Moreover, even if such a public disclosure had occurred, of which Relator is unaware, Relator would be considered an "original source" for substantial investigation, information discovery, and analysis on which the allegations or transactions in this Complaint are based. 31 USC § 3730(e)(4)(B)(2).

25.     Moreover, although the simple fact that the Defendants applied for and received PPP funding was publicly disclosed by the SBA and possibly elsewhere, Fraud Forensics, LLC, through its extensive, independent research and investigation, has acquired, maintains, and protects as private and confidential, unique and proprietary facts, data, information and knowledge obtained independently from, and which materially add to any publicly disclosed information, allegations, facts or transactions. Fraud Forensics, LLC provided, from their proprietary database, independent and material information relating to this Complaint to the United States Attorney for this District prior to filing this action, as required by 31 U.S.C. § 3730 (e)(4)(B)(2).

26.     Relator, through diligent use of its unique and proprietary database, compiled through extensive independent investigations, paid research, and requests using the Freedom of Information Act (FOIA), provides, in this Sealed Complaint, certain invaluable and highly relevant, originally sourced documentary evidence and related factual information concerning each Defendant and their actions, which justifies the Government, acting through the USDOJ, in exercising its veto power over any defensive assertion of the public disclosure bar.[3]

---

[2] Section 3730(e)'s public-disclosure bar was once deemed jurisdictional in nature but that is no longer the case after amendments to the FCA that were enacted in 2010 as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.
[3] In the alternative, even if a public disclosure did occur and Taxpayers Against Fraud, LLC fails to qualify as an original source, the Government has the sole veto power, under 31 U.S.C. § 3730(e)(4)(A), to oppose any motion to dismiss based on that public disclosure bar, and, in that circumstance, the action is not subject to dismissal. (In a recent decision, U.S. ex rel. Vermont National Telephone Co. v. Northstar Wireless LLC, No. 15-0728, __ F. Supp. 3d __, 2023 WL 7407301 (D.D.C. Nov. 19, 2023), a district court confirmed that the government's veto power over

27.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (Federal Question) and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction in this District Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

28.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this District.

29.     Pursuant to U.S.C. § 3730(b), this Complaint is to be filed *in camera* and to remain under seal for at least sixty days and shall not be served on any Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty days after the Government receives the Complaint or at such other time as the Court may order.

## III.   SBA LOAN FACTS

30.     Villa Maria Nursing & Rehabilitation Center, Inc. received a first draw PPP loan number 5257457107 on 4/13/2020 in the amount of $4,926,000 (Four Million, Nine Hundred Twenty-Six Thousand Dollars).  On 6/11/2021, this loan was forgiven, including accrued interest totaling $4,982,375 (Four Million, Nine Hundred Eighty-Two Thousand, Three Hundred Seventy-Five Dollars).  Villa Maria Nursing & Rehabilitation Center, Inc. received a second draw PPP loan number 7461399003 on 5/25/2021 in the amount of $2,000,000 (Two Million Dollars).  On 6/21/2022, this loan was forgiven, including accrued interest totaling $2,021,555 (Two Million Twenty-One Thousand Five Hundred Fifty-Five Dollars).  They were not eligible for a second draw loan due to their ineligibility for a first draw loan.

---

a dismissal based on the public disclosure bar of the False Claims Act (FCA) is absolute and can be effectuated by a mere notice of the government's opposition.)

31.    Catholic Health Care Transitions Services, Inc. received a first draw PPP loan number 6447337101 on 4/14/2020 in the amount of $19,600 (Nineteen Thousand Six Hundred Dollars).  On 4/14/2021, this loan was forgiven, including accrued interest totaling $19,792. (Nineteen Thousand Seven Hundred Ninety-Two Dollars).

32.    St. Johns Rehabilitation Hospital and Health Care Center received a first draw PPP loan number 6299477105 on 4/14/2020 in the amount of $2,509,000 (Two Million, Five Hundred Nine Thousand Dollars).  On 6/11/2021, this loan was forgiven, including accrued interest totaling $2,537,714 (Two Million, Five Hundred Thirty-Seven Thousand, Seven Hundred Fourteen Dollars).

33.    St. Anne's Nursing Center & St. Anne's Residence, Inc. received a first draw PPP loan number 8465117206 on 4/28/2020 in the amount of $2,019,700 (Two Million, Nineteen Thousand Seven Hundred Dollars).  On 6/9/2021, this loan was forgiven, including accrued interest totaling $2,041,917 (Two Million Forty-one Thousand Nine Hundred Seventeen Dollars).

34.    Villa Maria Healthcare Services, Inc. received a first draw PPP loan number 2937647105 on 4/11/2020 in the amount of $267,500 (Two Hundred Sixty-Seven Thousand, Five Hundred Dollars).  On 4/26/2021, this loan was forgiven, including accrued interest totaling $270,212 (Two Hundred Seventy Thousand, Two Hundred Twelve Dollars).  Villa Maria Healthcare Services, Inc. received a second draw PPP loan number 3202048908 on 4/27/2021 in the amount of $259,280 (Two Hundred Fifty-Nine Thousand, Two Hundred Eighty Dollars).  On 5/4/2022, this loan was forgiven, including accrued interest totaling $261,944 (Two Hundred Sixty-One Thousand, Nine Hundred Forty-Four Dollars).  They were not eligible for a second draw loan due to their ineligibility for a first draw loan.

35.    St. Joseph Residence, Inc. received a first draw PPP loan number 2311977402 on 5/5/2020 in the amount of $194,200 (One Hundred Ninety-Four Thousand, Two Hundred Dollars).  On 4/21/2021, this loan was forgiven, including accrued interest totaling $196,050 (One Hundred Ninety-Six Thousand, Fifty Dollars).

36.    Catholic Home Health Services of Broward, Inc. received a first draw PPP loan number 8912987310 on 5/1/2020 in the amount of $269,000 (Two Hundred Sixty-Nine Thousand Dollars).  On

4/21/2021, this loan was forgiven, including accrued interest totaling $271,570 (Two Hundred Seventy-One Thousand, Five Hundred Seventy Dollars).

37.     Catholic Hospice, Inc. received a first draw PPP loan number 9541377004 on 4/9/2020 in the amount of $4,330,300 (Four Million, Three Hundred Thirty Thousand, Three Hundred Dollars).  On 6/2/2021, this loan was forgiven, including accrued interest totaling $4,378,414 (Four Million, Three Hundred Seventy-Eight Thousand, Four Hundred Fourteen Dollars).

38.     Catholic Health Services, Inc. received a first draw PPP loan number 4890587308 on 4/30/2020 in the amount of $1,522,100 (One Million, Five Hundred Twenty-Two Thousand, One Hundred Dollars).  On 6/15/2021, this loan was forgiven, including accrued interest totaling $1,539,097 (One Million, Five Hundred Thirty-Nine Thousand, Ninety-Seven Dollars).

## IV.   LEGAL AND REGULATORY FRAMEWORK

### A. Overview of the False Claims Act, as Applicable to This Complaint

39.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the government and protects federal funds.  The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).[4]

40.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

---

[4] While the submission of false or fraudulent claims to the Government for payment is the primary act punishable under the FCA, the Act also prohibits similar fraudulent conduct, including making false records or statements material to a false claim, § 3729(a)(1)(B), conspiring to violate the FCA, § 3729(a)(1)(C), and others, § 3729(a)(1)(D)-(G).

41.     The False Claims Act also contains a "reverse false claim" provision, which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  The term obligation includes "the retention of any overpayment." *Id.* § 3729(b)(3).  An "overpayment" means any funds that a person or entity receives or retains to which that person or entity is not entitled.  42 U.S.C. § 1320a–7k(d)(4)(B).

42.     The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729 (b)(1)(B).

43.     The False Claims Act defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

44.     The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government; (iii) provides or has provided any portion of the money or property requested or demanded; or (iv) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

45.     The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). A request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program

requirement, by the use of a false statement or by means of other fraudulent conduct, qualifies as a "claim" under the False Claims Act. *Id.* at 232-33 (noting that the term "claim" is not limited to legally enforceable claims but includes all fraudulent attempts to cause government to pay out money).

46.     The False Claims Act is an "expansive" statute, reaching "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Neifert-White Co.*, 390 U.S. at 232).

47.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [\$13,508] and not more than [\$27,018], plus three times the amount of the damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1) (emphasis added); 28 C.F.R. § 85.5(a); Pub. L. No. 101-410.[5]

48.     The provisions of the FCA can be enforced by the DOJ, which is empowered to bring actions of its own accord (*see* § 3730(a)), but the FCA also allows private individuals with knowledge of fraud to bring a suit on behalf of the government. § 3730(b)(1). These whistleblowers are known as *qui tam* relators.

49.     Relators are an important means of unearthing fraud on the Government. The United States Department of Justice has estimated that government fraud drains as much as 10% of the total federal budget but noted that "most fraud goes undetected."[6] Whistleblower actions by private relators account for 64% of all successful FCA recoveries by the Government.[7] Without the assistance of these whistleblowers, the majority of fraud against public assets would go unaddressed.  Wherever there is a

---

[5] The exact amount of civil penalties actually increases over the years because they are subject to adjustment under the Federal Civil Penalties Inflation Adjustment Act of 1990.  § 3729(a)(1) (citing Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890).

[6] S. Rep. No. 99-345, at 2 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5268.

[7] U.S. Gov't Accountability Off., Information on False Claims Act Litigation 5 (2006), https://www.gao.gov/new.items/d06320r.pdf.

significant investment of public assets, whistleblower programs like the FCA are necessary to ensure that those assets are used efficiently.

50.    To encourage relators to come forward and bring to light allegations of fraud that they are aware of, the FCA entitles relators to a portion of any monetary recovery obtained in a *qui tam* case. § 3730(d)(1), (2). In cases in which the Government intervenes, the relator's share typically ranges from 15-25% of the total recovery, with the precise amount determined based on, *inter alia*, the relator's specific contributions to the action and whether the Government intervenes to pursue the claim.[8] Given the large recoveries under the FCA's treble damages regime, the relator's share serves as a powerful incentive for would-be whistleblowers.

## V.    THE SBA PAYCHECK PROTECTION PROGRAM

### A.  SBA Loan Programs in General

51.    Created in 1953, the mission of the United States Small Business Administration is to help small business owners and entrepreneurs pursue the American dream.  The SBA is a cabinet-level agency of the United States.  It is fully dedicated to small businesses and provides counseling, capital, and contracting expertise as the nation's only go-to resource and voice for small businesses.

52.    The SBA works with lenders to provide loans to small businesses.  The SBA doesn't lend money directly to small business owners.  Instead, it sets guidelines for loans made by its partnering lenders, community development organizations, and micro-lending institutions.

---

[8] Under § 3730(d)(1), if the Government intervenes, the relator is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." If the Government declines to intervene, the relator can receive an even larger share, between 25 percent and 30 percent of the case proceeds. § 3730(d)(2). If the Court finds that the relator planned and initiated false claims, they may be dismissed from the action and will receive no share of the recovery. § 3730(d)(3).

53.    Loans guaranteed by the SBA range from small to large and can be used for most business purposes, including long-term fixed assets and operating capital. Certain loan programs set restrictions on how businesses can use the funds.

54.    Additionally, SBA loan programs have unique eligibility requirements. In general, eligibility is based on what a business does to receive its income, the character of its ownership, and where the business operates. Qualified businesses must meet size standards, be able to repay, and have a sound business purpose.

### B.  The Paycheck Protection Program - PPP

55.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March, 2020 to provide financial assistance to Americans suffering economic harm resulting from the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses, which would facilitate employee retention through the maintenance of payroll, despite drastic reductions in company revenue and possible worker "layoffs" and certain other expenses. This was accomplished through a program referred to as the Paycheck Protection Program (PPP).

56.    To obtain a PPP loan, a qualifying business submitted a PPP loan application which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the PPP program's rules and to make certain affirmative certifications to receive the PPP loan, including representations that the business was in operation on February 15, 2020. The business was also required to provide, among other things, its (a) average monthly payroll expenses and (b) number of employees (headcount). These figures were used to determine eligibility and to calculate the amount of money the business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation of their payroll expenses.

57.    The CARES Act required PPP loan applications to be processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the Small Business Administration ("SBA''). Data from the application, including information about the borrower, the total amount of the loan, the listed number of employees, and the volume of the business were transmitted by the lender to the SBA, which then relied on those representations in processing the application and approving the loan.

58.    PPP loan proceeds were required to be used by the business for certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on eligible expense items within a designated period, and used a defined portion of the PPP loan proceeds on payroll expenses.

**C. Laws, Regulations, and Guidance for the PPP**

59.    On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

60.    Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the Paycheck Protection Program ("PPP"). Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

61.    Title I of the CARES Act established PPP under a new Section, 7(a)(36) of the Small Business Act of 1953 (the "Small Business Act"). PPP was subsequently expanded by the Paycheck Protection Program and Health Care Enhancement Act, which was signed into law on April 24, 2020,

and extended by the Paycheck Protection Program Flexibility Act (the "Flexibility Act"), which was signed into law on June 5, 2020.

62.   The SBA and the United States Department of the Treasury ("Treasury") worked together to implement the PPP, releasing regulations and guidance on a regular basis.

63.   Loans issued by lenders under the PPP were 100 percent guaranteed by SBA, and the full principal amount of the loans could qualify for loan forgiveness.

64.   Because PPP is a loan program under Section 7(a) of the Small Business Act, it is subject to the regulations applicable to SBA Section 7(a) business loans except when the CARES Act or applicable regulations provide otherwise.

65.   Section 7(a) loan regulations are generally found in 13 C.F.R. part 120.  PPP was also made subject to the SBA "affiliation" rules, located at 13 C.F.R. § 121.301(f).

66.   In addition to the laws and regulations that apply to PPP loans, beginning in April 2020, the SBA has on numerous occasions issued ongoing official guidance regarding PPP loans.  Two of the primary mechanisms used by the SBA to provide this guidance are interim final rules ("IFRs") and public answers to frequently asked questions ("SBA FAQs").  Specific guidance relevant to these actions are discussed below.

67.   SBA published its Interim Final Rule on Business Loan Program Temporary Changes; Paycheck Protection Program ("IFR #1") on April 2, 2020. Thereafter, it issued numerous additional IFRs, including IFRs issued on April 3, 2020 ("IFR #2" Applicable Affiliation Rules); April 28, 2020 ("IFR #4" Promissory Notes, Authorizations, Affiliation, and Eligibility); April 30, 2020 ("IFR #7" Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders); May 8, 2020 ("IFR #9" Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan Request); May 20, 2020 ("IFR #13" Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting); May 22, 2020 ("IFR #14" Loan Forgiveness; and "IFR #15" SBA Loan Review Procedures and Related Borrower and Lender

Responsibilities); June 11, 2020 ("IFR #17" Revisions to First Interim Final Rule[9]); June 22, 2020 ("IFR #20" Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule[10]). Each of these IFRs can be found on the SBA's website, at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#id-interim-final-rules.

68.    Between April 6, 2020, and May 9, 2024, the SBA published answers to questions about the PPP program on twenty-six occasions.[11] These regularly updated question-and-answer documents (the "SBA FAQ") are posted on the SBA and Treasury websites. The first version of the SBA FAQ was published on April 6, 2020, and included answers to 18 questions. By the end of April 2020, the SBA would release 7 additional versions of its FAQ, which by April 29, 2020 (version 8) had expanded to 39 questions. The most recent version (version 26) was released on May 9, 2024, and included answers to 73 questions.

### D.  PPP Loan Eligibility

69.    A business was eligible for a First Draw PPP loan if it met any one of the following standards:

---

[9] IFR #17 revised IFR #1 to account for changes made by the Flexibility Act, which was signed into law in June 2020.

[10] IFR #20 revised IFR #14 and IFR #15 to account for changes made by the Flexibility Act.

[11] *See* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. Later versions generally included the questions from earlier versions, updating answers as needed, or if no updates were necessary, reprinting the original answers. Throughout this Complaint, Relator cites to the final Q&A version (version 26, published May 9, 2024, *available at* https://www.sba.gov/sites/default/files/2024-05/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-73%20%28FINAL%205-9-24%29%20508.pdf), except where it is necessary to cite to earlier versions containing information that was later changed. Where appropriate, Relator provides information about the date on which the information in the Q&A was originally published by the SBA.

a.        *Together with its affiliates (*emphasis added*)*, it has 500 or fewer employees, regardless of their principal place of residence. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I); SBA FAQ Question 44 (published May 13, 2020).

b.        *Together with its affiliates (*emphasis added*)*, it meets the SBA (employee-based or receipts-based) size standard for the North American Industry Classification System ("NAICS") code applicable to its primary industry.[12] *See* 15 U.S.C. § 636(a)(36)(D)(i)(II); SBA FAQ Question 3 (published April 6, 2020).

c.        Its primary industry is in NAICS category 72 (accommodations and food service), <u>and</u> it has, *together with its affiliates (*emphasis added*)*, no more than 500 employees per physical location. *See* 15 U.S.C. § 636(a)(36)(D)(iii)(I).

d.        On its own (i.e., regardless of its affiliates), it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, <u>and</u> *together with its affiliates* (emphasis added), it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher. *See* 13 C.F.R. § 121.301(a); SBA FAQ Question 2 (published April 6, 2020).

e.        Housing cooperatives, eligible 501(c)(6) organizations and eligible destination marketing organizations are eligible for a First Draw PPP Loan only if they employ no more than 300 employees.

f.        It has, *together with its affiliates* (emphasis added), $15 million or less of tangible net worth as of March 27, 2020, and $5 million or less of average net income after

---

[12] SBA size standards based on industry codes are found in 13 C.F.R. § 121.201. https://www.ecfr.gov/on/2020-04-15/title-13/chapter-I/part-121

Federal income taxes (excluding carry-over losses) for the last two full fiscal years before the date of application.13  See 15 U.S.C. § 632(a)(5)(B); SBA FAQ Question 2 (published April 6, 2020).

70.    In counting employees for purposes of determining PPP eligibility, PPP applicants may use (a) their average number of employees over the previous 12 months, (b) their average number of employees for calendar year 2019, or (c) their average number of employees for each pay period during the last 12 calendar months completed prior to the loan application.  If the business has been operational for less than 12 months, it may use the average number of employees for each of the pay periods that it has been operational.  *See* 13 C.F.R. § 121.106(b); SBA FAQ Question 14 (published April 6, 2020).  To meet the eligibility test of what constitutes an "employee" for PPP loan qualification, an expansive head-count test is used, which includes full-time, part-time, temporary, leased, and furloughed employees of the applicant's small business.  *See* 13 C.F.R. § 121.106(a).

71.    Of critical importance here, the SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483), stating that "<u>current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.</u>"" (underscore supplied) *See* IFR #4 § 2(b).

72.    SBA guidance further provides (*id*) that "Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."  See SBA FAQ Question 31 (published April 23, 2020).

73.    Unlike other SBA loans, which are available only to borrowers who are unable to obtain credit from sources other than the SBA, the CARES Act waived the "credit not available elsewhere"

---

13 In order to qualify using this method, the loan recipient must have **both** a $15 million or less of tangible net worth as of March 27, 2020, **and** a $5 million or less of average net income for the last two full fiscal years.

requirement for PPP loans. *See* 15 U.S.C. § 636(a)(36)(I). Thus, an applicant is not specifically required to show that it is unable to obtain credit elsewhere to get a PPP loan.

74.    Nonetheless, PPP borrowers must still certify that the PPP loan is necessary as part of the loan application and SBA FAQ Question 31 (published on April 23, 2020).

75.    For applicants that applied for and received a PPP loan but then believed, based on subsequent SBA guidance, that they could not certify in good faith that current economic uncertainty makes their PPP loan necessary to support their ongoing operations, the SBA provided a safe harbor that permitted borrowers to repay PPP loans in full by May 18, 2020. *See* IFR #4 § 5, as modified by IFR #9 and IFR #13 § 1.[14] *See also* SBA FAQ Question 31, as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

76.    Further, concerning this "safe harbor provision, the SBA stated that: "Any borrower that, *together with its affiliates* (emphasis added), received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan. *See* SBA FAQ Question 46 (published May 13, 2020).[15]

### E.    SBA PPP Affiliation Rules

77.    The SBA defines "affiliation" as one business controlling or having the power to control another or when a third party (or parties) controls or has the power to control both businesses. S*ee* 13 C.F.R. § 121.301(f); Affiliation Guidance.  The SBA has an expansive view of what constitutes

------------

[14] The original safe harbor deadline was May 7, 2020, but that was subsequently extended through IFR #9 and IFR #13 to May 18.

[15] https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf. Question 46 was first published on May 13, 2020 and then revised twice in March 2021, before eventually being deleted from the FAQ in July 2021, after SBA discontinued the loan necessity questionnaire.

"control," and it does not matter whether control is exercised so long as the power to control exists. SBA applies four specific affiliation rules[16] for purposes of the PPP size tests:

a.      Affiliation based on ownership. For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50% of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the board of directors or president or chief executive officer (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control if that individual or entity has the ability, under the concern's charter, bylaws, or shareholders' agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders. See 13 C.F.R. § 121.301(f)(1).

b.      Affiliation arising under stock options, convertible securities, and agreements to merge. For purposes of determining control and affiliation, options, convertible securities, and agreements to merge (including agreements in principle) are considered effective as if exercised or consummated, as the case may be, unless subject to conditions precedent which are incapable of fulfillment, speculative, conjectural, or unenforceable under state or Federal law, or where the probability of the transaction (or exercise of the rights) occurring is shown to be extremely remote. Significantly, a person or entity that controls one or more other entities cannot use options, convertible securities, or agreements to appear to eliminate control before actually doing so. SBA will not give present effect to a person's or entity's ability to divest all or part of its ownership interest in order to avoid a finding of affiliation. See 13 C.F.R. § 121.301(f)(2).

---

[16] Affiliation Rules Applicable To U.S. Small Business Administration Paycheck Protection Program
https://home.treasury.gov/system/files/136/Affiliation%20rules%20overview%20%28for%20public%29.pdf

c. Affiliation based on management.  Where the chief executive officer or president of an entity (or other officers, managing members, or partners who control the management of the entity) also controls the management of another entity, the two entities will be deemed affiliates under common control.  Where a single person or entity that controls the board of directors or management of one entity also controls the board of directors or management of another entity, the two entities will be deemed affiliates under common control.  Where a person or entity controls the management of another entity through a management agreement, the entities are deemed affiliated.  See 13 C.F.R. § 121.301(f)(3).

d. Affiliation based on identity of interest.  Where there is an identity of interest between close relatives with identical or substantially identical business or economic interests (e.g., in the same or similar industry in the same geographic area), such interests are presumed to be affiliated.  This presumption may be rebutted with evidence showing that the interests are separate.  See 13 C.F.R. § 121.301(f)(4).

78. The affiliation based on management criterion (rule c. above) is particularly relevant here, since where management of an entity is deemed to be an affiliate of a PPP applicant, all other affiliates of that manager (e.g., all other companies managed by the manager) shall be deemed affiliates of that PPP applicant.

79. Moreover, if the company is part of a family or series of companies under common management control, the affiliates of those entities would also be deemed affiliates of the PPP applicant. In many cases, such extended affiliation would make it impossible for the applicant to meet the size standards for PPP eligibility13 C.F.R. § 121.301(f)(3).

80. In addition, management companies are deemed affiliates of the companies they manage by virtue of common management or common control, which renders them affiliates of the companies they manage and may exclude that entire group of companies from PPP eligibility.  In any of these situations, a PPP applicant must account for affiliates in size determinations.  Plaintiff contends that these rules

were disqualifying under the fact pattern pled here but were nonetheless conveniently overlooked when the certifications at issue were made and signed.

81.     There are certain circumstances in which the affiliation rules do not apply.  See 15 USCS § 636(a)(36)(D)(iv). Specifically, the CARES Act waives the affiliation rules with respect to the eligibility of a PPP applicant that is one of the following:

a.     A business within NAICS category 72 that has no more than 500 employees.

b.     A franchise with a franchise identifier code assigned by SBA in the SBA Franchise Directory.

c.     A business that receives financial assistance from a small business investment company licensed by SBA ("SBIC"). It is alleged on information and belief that none of these statutory exceptions apply in the present action.

82.     A company controlled by a management company may qualify for a PPP loan using the tangible net worth and net income test (described above), assuming the company and its affiliates, which would include the management company's other controlled companies, meet the tangible net worth and net income tests on a combined basis, or in the alternative, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis.

**F.  PPP Loan Terms**

83.     PPP loans funded before the enactment of the Flexibility Act mature two years from the date of funding, see Interim Final Rule § 2(j), unless modified by the lender and borrower, see Flexibility Act § 2(b). PPP loans funded after the enactment of the Flexibility Act on June 5, 2020, mature five years after the date of funding.  See Small Business Act § 7(a)(36)(K)(ii), as amended by Flexibility Act § 2.

84.     No payments are due on a PPP loan until the SBA has paid the lender the amount of the PPP loan to be forgiven or notified the lender that no forgiveness will be allowed, but interest will accrue during that period. *See* 15 U.S.C. § 636(a)(36)(M)(ii), as amended by Flexibility Act § 3(c); Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

85.     Thereafter, most banks will charge monthly or quarterly payments of principal and interest until maturity. However, any borrower that does not apply for forgiveness within ten months after the end of its eight-week or 24-week covered period must begin making payments of principal and interest on or after the expiration of that ten-month period. *See* 15 U.S.C. § 636(a)(36)(M)(v), as amended by Flexibility Act § 3(c).

86.     Lenders must notify borrowers when SBA pays the forgiveness amount or determines that no forgiveness is allowed. *See* Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

### G.  The PPP Loan Application and Required Certifications

87.     The PPP Loan Application form requires the applicant to certify its number of employees.

88.     The PPP Loan Application form also requires the applicant to identify all its "owners," defining that term to mean any member owning 20% or more of the equity of the applicant.

89.     The loan application requires an express certification that the applicant "has read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

90.     The loan application also requires an express applicant's certification that "[t]he [borrower] is eligible to receive a loan under the rules in effect at the time this application is submitted, that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

91.     The loan application also requires an express certification that the applicant "employs no more than the greater of 500 or employees or, if applicable, the size standard (employee-based or receipts-based) established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

92.     The loan application also requires an express certification that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

93.     The loan application also requires the applicant to expressly certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

94.     The loan application also requires the applicant to expressly certify that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

95.     The loan application also requires the applicant to expressly certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and that "[the applicant] understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

96.     The loan application also requires the applicant to expressly certify that "[the applicant] acknowledge[s] that the lender will confirm the eligible loan amount using required documents submitted."

97.     The loan application requires an authorized representative of the applicant to sign.

98.     As noted, at least with respect to larger companies and businesses owned by private companies with adequate sources of liquidity, the SBA has indicated that applicants must take into account "their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* SBA FAQ Questions 31 (published April 23, 2020) and 37 (published April 29, 2020).  Accordingly, in making the express certification, applicants are required to consider their need for PPP funding in light of SBA FAQ Question 31, stated above.

99.     Absent the applicable express certifications for a PPP loan as described above, the applicant is not eligible to receive PPP loan funds and the lender cannot approve, nor the SBA accept/authorize funding of the PPP loan.

100.    Each of the foregoing PPP loan application certifications is a material condition to SBAs approval and payment of any claim submitted under the PPP.  SBA does not review PPP loan applications for approval prior to the loan funds being disbursed; instead, it relies on its lenders to comply with SBA requirements and to ensure that every loan is in fact eligible for the PPP.  The certifications are required for approval of the PPP loan application and for each applicant to receive payment of PPP loan funds.  The certifications are critical to SBA's and the United States' ability to ensure that only qualified and eligible loans are approved and paid.  These certifications are needed to protect SBA and the United States from undue risk, loss and fraud.

101.    The SBA permitted any borrower that received a PPP loan and found upon reconsideration that it could not make the required certification in light of SBA's guidance, to repay the PPP loan in full by May 18, 2020.  According to the SBA, it would deem any borrower that repaid by May 18, 2020, to have made the required certification of need in good faith.  *See* IFR #4 § III (5) as modified by IFR #9 § III and IFR #13 § III (1); SBA FAQ Question 31 (published April 23, 2020), as modified by SBA FAQ Question 43 (published May 5, 2020) and SBA FAQ Question 47 (published May 13, 2020).

102.    On May 13, 2020, the SBA published FAQ Question and Answer 46 ("FAQ 46"), which provides a new safe harbor based on the principal amount of PPP loans received by a borrower and its

affiliates: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." (Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan, as announced in IFR #2.)

103.  FAQ 46 also gives PPP borrowers with loans greater than $2 million that do not satisfy the new safe harbor a means to limit their exposure to sanctions from the SBA.  If the SBA determines that such a borrower did not have an adequate basis for the certification of need, SBA will notify the borrower and seek repayment in full of the PPP loan and tell the lender that the borrower is not eligible for loan forgiveness.  FAQ 46 provides that SBA will not pursue further administrative enforcement or refer the borrower to other governmental agencies based on its determination regarding the certification of need if the borrower repays the loan in full after receiving notification from SBA.  *See* SBA FAQ Question 46 (published May 13, 2020).

104.  Notably, repaying the loan pursuant to FAQ 46 does not shield the borrower from all potential liability.  FAQ 46 merely states that SBA will not pursue additional action based on a determination that the borrower lacked an adequate basis for the certification of need.  A borrower is still liable if there are other violations of the PPP statute or implementing regulations.  Further, nothing in FAQ 46 prevents the Government or a *qui tam* relator or whistleblower who believes that the borrower knowingly made a false statement in connection with its PPP loan application from bringing a complaint under the False Claims Act.

## VI.  VILLA MARIA NURSING & REHABILITATION CENTER, INC.'S FALSE AND FRAUDULENT CLAIMS SURROUNDING ITS APPLICATION FOR, RECEIPT OF, AND FAILURE TO REPAY PPP FUNDS

### A. The False Claims Act Defines "Knowingly"

105.  The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts

in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

### B. Villa Maria Nursing & Rehabilitation Center, Inc. Falsely Certified Compliance with the PPP Size and Affiliation Rules

106.    The CARES Act expressly limits PPP loans to businesses with fewer than 500 employees or those otherwise qualifying as a small business concern under other SBA standards, with certain limited exceptions, recited above, mentioned in paragraphs 107 and 108 below, and not operative here.

107.    For example, on its own (i.e., regardless of its affiliates), a company meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, and together with its affiliates, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher.

108.    The "alternative size standard" for PPP loans also allows businesses to qualify if, as of March 27, 2020, the maximum tangible net worth of the business is not more than $15 million) and their average net income after federal income taxes for the two full fiscal years before the date of the application was not more than $5 million.

109.    According to the SBA's affiliation rules, businesses must include the employees of affiliate businesses in their size determinations (underscore supplied). *See* 13 C.F.R. § 121.301(f); Affiliation Guidance.

### C. Facts Supporting Affiliation Among Defendants

110.    The affiliated entities share Officers, Directors, and Operators who manage the affiliated companies.

111.    Joseph Cantania was the President and CEO of all the Defendant companies at the time the Defendant companies applied for and received PPP loans.

112.   Aristides Pallin was the Chief Operating Officer of all the Defendant companies at the time the Defendant companies applied for and received PPP loans.

113.   David D'amico was the Chief Financial Officer of all the Defendant companies at the time the Defendant companies applied for and received PPP loans.

114.   Dr. Brian Kiedrowski was the Chief Medical Officer of all the Defendant companies at the time the Defendant companies applied for and received PPP loans.

115.   Because Defendants shared Officers, Directors and Operators, they met the test of interlocking management and control relationships which made all co-defendants legally affiliates according to the federal rules.

116.   As detailed above, these affiliations between all co-defendants must be used to determine the borrower's size for purposes of PPP loan eligibility.  Villa Maria Nursing & Rehabilitation Center, Inc. knew or should have known that it did not meet the PPP loan eligibility standards due to the combined size of its company, considering the uncontroverted entity-affiliation facts alleged in paragraphs 110 through 115 above.

117.   The CARES Act's limited waiver of the affiliation rules does not apply to Villa Maria Nursing & Rehabilitation Center, Inc. because Villa Maria Nursing & Rehabilitation Center, Inc.: (i) is not a business within NAICS category 72; (ii) is not a qualifying franchise; and (iii) does not have SBIC investment. *See* 15 USCS § 636(a)(36)(D)(iv). Thus, the affiliation rules apply to Villa Maria Nursing & Rehabilitation Center, Inc. and its affiliate companies, co-defendants herein.

**D.  Factual Allegations**

118.   Villa Maria Nursing & Rehabilitation Center, Inc., and its affiliated co-defendants violated the PPP rules by applying for more than one PPP loan.

119.   Lenders would not have funded or forgiven multiple loans for Villa Maria Nursing & Rehabilitation Center, Inc., and its affiliated co-defendants had they been aware of this fact.

120.   This is a material term of the PPP loan application, as evidenced by the Department of Justice seeking both False Claims Act and Financial Institutions Reform, Recovery and Enforcement Act penalties against entities and individuals who applied for and received multiple PPP loans.

121.   A small business concern was only eligible for a First Draw PPP Loan if the business had 500 or fewer employees or the business met the SBA employee-based or revenue-based size standard for the industry in which it operates (if applicable).

122.   Upon information and belief, Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates did not qualify for a PPP loan under the employment test because it employed more than 500 employees, as evinced by their own loan applications, and, upon information and belief, its combined annual receipts exceeded the SBA limits.

**E.   Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates factually misreported the number of their employees in their certified applications.**

123.   Relator is informed and believes, and thereon alleges, that Villa Maria Nursing & Rehabilitation Center, Inc., together with its co-defendant affiliates, knowingly had more than 500 employees when they filed their PPP applications. *See* 15 USCS § 636(a)(36)(D)(i)(I); SBA FAQ Question 44.  According to Relator's research, Villa Maria Nursing & Rehabilitation Center, Inc., together with its affiliates, had approximately 2,359 employees and an estimated annual gross revenue of over $168,247,476 (One Hundred Sixty-Eight Million Two Hundred Forty-Seven Thousand Four Hundred Seventy-Six Dollars) when they filed their PPP applications.  The Defendants' employee count exceeded the SBA standard by 472% (Four Hundred Seventy-Two Percent), and these affiliated entities exceeded the revenue standard by 561% (Five Hundred Sixty-One Percent).

124.   Villa Maria Nursing & Rehabilitation Center, Inc. reported 500 Employees in its PPP application.  Upon Relator's information and belief, Villa Maria Nursing & Rehabilitation Center, Inc. had approximately 676 Employees and an estimated annual gross revenue of $51,713,450 at the time of Villa Maria Nursing & Rehabilitation Center, Inc.'s PPP application.

125. Catholic Health Care Transitions Services, Inc. reported 7 Employees in its PPP application. Upon Relator's information and belief, Catholic Health Care Transitions Services, Inc. had approximately 9 Employees and an estimated annual gross revenue of $228,517 at the time of Catholic Health Care Transitions Services, Inc.'s PPP application.

126. St. Johns Rehabilitation Hospital and Health Care Center reported 294 Employees in its PPP application. Upon Relator's information and belief, St Johns Rehabilitation Hospital and Health Care Center had approximately 434 Employees and an estimated annual gross revenue of $26,769,445 at the time of St Johns Rehabilitation Hospital and Health Care Center's PPP application.

127. St. Anne's Nursing Center & St. Anne's Residence, Inc. reported 235 Employees in its PPP application. Upon Relator's information and belief, St. Anne's Nursing Center & St. Anne's Residence, Inc. had approximately 343 Employees and an estimated annual gross revenue of $22,959,205 at the time of St. Anne's Nursing Center & St. Anne's Residence, Inc.'s PPP application.

128. Villa Maria Healthcare Services, Inc. reported 56 Employees in its PPP application. Upon Relator's information and belief, Villa Maria Healthcare Services, Inc. had approximately 106 Employees and an estimated annual gross revenue of $1,744,221 at the time of Villa Maria Healthcare Services, Inc.'s PPP application.

129. St. Joseph Residence, Inc. reported 31 Employees in its PPP application. Upon Relator's information and belief, St. Joseph Residence, Inc. had approximately 46 Employees and an estimated annual gross revenue of $2,839,493 at the time of St. Joseph Residence, Inc.'s PPP application.

130. Catholic Home Health Services of Broward, Inc. reported 45 Employees in its PPP application. Upon Relator's information and belief, Catholic Home Health Services of Broward, Inc. had approximately 68 Employees and an estimated annual gross revenue of $1,735,846 at the time of Catholic Home Health Services of Broward, Inc.'s PPP application.

131. Catholic Hospice, Inc. reported 453 Employees in its PPP application. Upon Relator's information and belief, Catholic Hospice, Inc. had approximately 582 Employees and an estimated annual gross revenue of $45,031,224 at the time of Catholic Hospice, Inc.'s PPP application.

132. Catholic Health Services, Inc. reported 102 Employees in its PPP application. Upon Relator's information and belief, Catholic Health Services, Inc. had approximately 91 Employees and an estimated annual gross revenue of $15,226,075 at the time of Catholic Health Services, Inc.'s PPP application.

133. Villa Maria Nursing & Rehabilitation Center, Inc. and its affiliates knowingly failed to meet the SBA revenue-based size standard for the NAICS code applicable to its primary industry of $30 million dollars. Villa Maria Nursing & Rehabilitation Center, Inc.'s NAICS code is 623110 ("Nursing Care Facilities (Skilled Nursing Facilities)"), and the applicable revenue-based business size standard for code 623110 is $30 million dollars in gross revenue. Accordingly, Villa Maria Nursing & Rehabilitation Center, Inc. was disqualified from receiving the loan because it exceeded the NAICS size standard. Villa Maria Nursing & Rehabilitation Center, Inc., and its affiliates far exceeded the maximum allowable amount, $30 Million dollars, with a combined affiliate income of $168,247,476 (One Hundred Sixty-Eight Million Two Hundred Forty-Seven Thousand Four Hundred Seventy-Six Dollars), which is 561% (Five Hundred Sixty-One Percent) in excess of the SBA limit. Villa Maria Nursing & Rehabilitation Center, Inc., and its affiliates, knew from their financial records that they fraudulently misreported their size, revenue, and number(s) of employees, all in direct violation of the FCA.

134. Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates' primary industry is not NAICS category 72 (accommodations and food service). See 15 USCS § 636(a)(36)(D)(iii). Accordingly, Villa Maria Nursing & Rehabilitation Center, Inc. could not rely on that category's divergent and lower business size-standard test to qualify for PPP loans.

135. Villa Maria Nursing & Rehabilitation Center, Inc., together with its affiliates, does not meet the receipts/revenue-based size standard established by SBA for the NAICS code applicable to its primary industry (623110), and, together with its affiliates, it does not meet the receipts/revenue-based size standard established by SBA for the NAICS code applicable to the higher of its primary industry or the primary industry of itself and its affiliates on a combined basis. 21 See 13 C.F.R. § 121.301(a); SBA FAQ Question 2. The applicable revenue-based size standard of $30 million dollars in gross revenue was

exceeded 561% (Five Hundred Sixty-One Percent) in the case of the PPP loan applications submitted by Defendants.

136.   Based on the foregoing, Villa Maria Nursing & Rehabilitation Center, Inc. (and its co-defendant affiliates) knowingly and fraudulently misrepresented their employee count, their compliance with the PPP size and affiliation rules, and their eligibility for PPP loans.

137.   Villa Maria Nursing & Rehabilitation Center, Inc. (and its co-defendant affiliates) knowingly made false certification of employee counts, and/or gross revenues, which were material and relied upon by the Government.  Those false certifications affected its (and its co-defendant affiliates') eligibility for the PPP loans and, in turn, influenced the SBA's decision to approve those loans.

138.   Additionally, based on the foregoing, upon Relator's information and belief, Villa Maria Nursing & Rehabilitation Center, Inc.'s other affiliated companies, Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc, also knowingly miscalculated and misrepresented their employee-count, and gross revenues, their compliance with the PPP size and affiliation rules, and their eligibility for a PPP loan.

139.   Villa Maria Nursing & Rehabilitation Center, Inc. knowingly, falsely, and fraudulently certified that it was in compliance with the applicable size, employee count, gross revenue, and affiliation rules applicable to PPP loans when, in fact, it knew it was not in compliance with those rules.

140.   The government relied on the false certifications and representations made by Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates regarding their size, finances, and affiliations, allowing Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates to obtain PPP funds to which they were not entitled and to avoid repaying those funds when thus not qualified for loan forgiveness.

F. **Villa Maria Nursing & Rehabilitation Center, Inc. Failed to Repay PPP Loan Funds for Which It Was Not Entitled to Forgiveness**

141. Relator is informed and believes, and thereon alleges, that Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates were ineligible to receive PPP loans and subsequently failed, given the opportunity, to repay the wrongfully acquired PPP loan funds received, which they were, knowingly, *ab initio,* ineligible for.

142. Based on Relator's information and belief, Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates did not take advantage of the SBA's safe harbor (repayment) provisions, which would allow borrowers to repay their misbegotten PPP loans by May 18, 2020, and, by so doing, cannot be deemed to have made their required certifications of need in good faith. IFR #4 § 5, as modified by IFR #9 and IFR #13 § 1; SBA FAQ 31, as modified by FAQ Question 43 and FAQ Question 47.

143. Moreover, because the loans received and retained by Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates exceeded two million dollars ($2,000,000), the statutory good faith safe harbor provision relating to necessity was unavailable to them. SBA FAQ Question 46.

144. The Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates also knowingly and fraudulently avoided and/or wrongfully concealed their clear obligations to return PPP loan funds to the Government. Loan forgiveness was not legally available to them.

## VII.   LEGAL CLAIMS

### A.  COUNT I Violation of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))

145. Relator repeats and realleges each of the foregoing paragraphs and allegations as though fully set forth herein.

146. Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St. Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic

Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc., all, jointly and severally, violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and/or causing to be presented to the SBA false and/or fraudulent claims for payment or approval in connection with their applications for, receipt of (and failure to repay) PPP loans.

147.   Upon Relator's information and belief, the United States paid, authorized, and/or approved the false and/or fraudulent claims submitted by defendants because of and reliance on defendants Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St. Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc.'s concealments and (mis)representations, which payments, authorizations or approvals of PPP loans would not have been paid or approved but for all affiliated co-defendants' unlawful conduct. The Government, the SBA, as well as the United States Taxpayers, all incurred substantial and provable monetary damages because of Defendants' fraudulent misconduct, in total amounts according to proof.

148.   Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St. Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc.,  Catholic Health Services, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. conduct was knowing, in that all affiliated co-defendants had actual or constructive knowledge that the claims, certifications, and statements made in connection with their applications for PPP loans and/or PPP loan forgiveness, were false and fraudulent and, all co-defendant affiliates nevertheless intentionally submitted those false and fraudulent claims, certifications, and statements in order to receive and/or retain funds to which they were not legally entitled.

**B.  COUNT II Violation of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))**

149.   Relator repeats and realleges each of the foregoing paragraphs and allegations as though fully set forth herein.

150.   The named and affiliated Co-Defendants, Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St. Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc., all, both independently, jointly and severally, violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, false records, certifications of fact or statements: (i) material to false or fraudulent claims for payment of loans, by lenders, authorized by the SBA; and/or (ii) in order to fraudulently induce PPP loan funding to be paid or approved; and (iii) which claims the United States did in-fact pay or approve, all in connection with Villa Maria Nursing & Rehabilitation Center, Inc. and its co-defendant affiliates' receipt of (and failure to repay) PPP loans.

151.   Upon Relator's information and belief, the United States paid or approved Defendants' false and/or fraudulent claims and applications because of Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc.'s acts and representations, which funding would not have been paid or approved but for all defendant affiliated entities' unlawful and fraudulent conduct, thereby incurring monetary damages as a result, as herein set forth and according to further proof.

152.   Villa Maria Nursing & Rehabilitation Center, Inc. and all its co-defendant affiliate entities had actual or constructive knowledge that the claims, certifications, and statements made in connection with their application for PPP loans and/or PPP loan forgiveness were false and fraudulent. Villa Maria Nursing & Rehabilitation Center, Inc., along with all its co-defendant affiliate entities, nevertheless

intentionally submitted those claims, certifications, and statements in order to receive and/or retain funds to which they were not legally entitled.

## C. COUNT III Violation of the False Claims Act's Reverse False Claims Provision (31 U.S.C. § 3729(a)(1)(G))

153. Relator repeats and realleges each of the foregoing paragraphs and allegations, as though fully set forth herein.

154. Defendants, Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. violated the so-called "reverse false claim" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), by knowingly making or using a false record or statement for the purpose of avoiding or decreasing an obligation owed to the United States in connection with their receipt of (and failure to repay) PPP loans.

155. Defendants, Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. retained overpayments or avoided an obligation to repay PPP loan funds to the Government, and the United States incurred substantial monetary damages as a result.

156. Defendants, Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc., and their affiliated co-defendants had actual or constructive knowledge that the claims,

certifications, and statements made in connection with their applications for PPP loan forgiveness were false and fraudulent, and nevertheless intentionally submitted those claims, certifications, and statements in order to retain and avoid repayment of funds to which they were not legally entitled.

157. The acts, statements, certifications, and concealments herein alleged were made in knowing violation of cited sections of the FCA and other relevant laws and regulations, directly and proximately causing the monetary and other damages claimed by plaintiffs, justifying the relief sought below. [17]

## RELIEF REQUESTED

WHEREFORE, Relator, acting on behalf of and in the name of the United States and on its own behalf, demands and prays that judgment be entered against Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. as follows:

That Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. cease and desist from further violating the False Claims Act, 31 U.S.C. §§ 3729 et seq;

A.      That Villa Maria Nursing & Rehabilitation Center, Inc., Catholic Health Care

Transitions Services, Inc., St Johns Rehabilitation Hospital and Health Care Center, St. Anne's

---

[17] Relator acknowledges that it lacks authority or influence around potential charging decisions relating to the offenses discussed here. A fulsome discussion of remedies would seem remiss without reference to criminal charges and penalties potentially associated with these allegations. Those include, without limitation: Violation of the FCA 31 U.S.C. §§3729–3733; Making False Statements to the SBA 18 U.S.C. §1014; Making False Statements to an FDIC-Insured Bank 18 U.S.C. § 1014; Bank Fraud 18 U.S.C. § 1344; Wire Fraud 18 U.S.C. § 1343; Tax Evasion (26 U.S.C. § 7201; and Conspiracy 18 U.S.C. § 371 & 18 U.S.C. § 1349.

Nursing Center & St. Anne's Residence, Inc., Villa Maria Healthcare Services Inc., St. Joseph Residence, Inc., Catholic Home Health Services of Broward, Inc., Catholic Hospice Inc., and Catholic Health Services, Inc. pay an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus civil penalties as are required by law in the amount of not less than $11,665 and not more than $23,331 for violation of the False Claims Act.;

B.      That Defendants return to the Government all of their ill-gotten loan proceeds in the approximate sum, as hereafter calculated, in excess of $18,520,642 (Eighteen Million Five Hundred Twenty Thousand Six Hundred Forty-Two Dollars);

C.      That Defendants reimburse the SBA for loan processing fees paid to the lender banks in the amount of $253,992 (Two Hundred Fifty-Three Thousand Nine Hundred Ninety-Two Dollars)

D.      Pre-judgment and post-judgment interest;

E.      That Relator be awarded the maximum sum authorized in 31 U.S.C. § 3730(d)(1)-(2);

F.      That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

G.      That The United States and Relator be granted such other and further relief as the Court deems just and appropriate.


**RELATOR HEREBY DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,

Relator/Plaintiff: FRAUD FORENSICS, LLC.

Date: October __31__ , 2024

By their attorney;

Kathryn W. Drey, Esq.
Attorney for Plaintiff-Relator

RDC 07



# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE
### ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.



USPS.COM/PICKUP



PS10001000006

EP13F July 2022
OD: 12 1/2 x 9 1/2

This package is made from post-consumer waste. Please recycle – again.

**UNITED STATES POSTAL SERVICE®**

PRIORITY MAIL EXPRESS®

EI 234 785 008 US



**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT)   PHONE 861-333-2474

Kathryn W. Drey
16777 Pend. So Key Dri, 307
Pensacola, FL 32507

**DELIVERY OPTIONS (Customer Use Only)**

TO: (PLEASE PRINT)
Ms. Angela E. Nobles
U.S. Courthouse Attn: Civil Process Clerk
400 North Miami Ave.
Miami, FL
3 3 1 2 8 -

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

⇨ PEEL FROM THIS CORNER

**PAYMENT BY ACCOUNT (if applicable)**

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code: 36009
Scheduled Delivery Date: 10/22/24
Postage: $32.00

Date Accepted: 10/21/24
Scheduled Delivery Time: PM
12:51 PM

Total Postage & Fees: $32.00

**DELIVERY (POSTAL SERVICE USE ONLY)**

REC'D BY   D.C.

OCT 2·3 2024





**UNITED STATES POSTAL SERVICE®**